All right, we're happy to hear argument in United States v. Hassan and Mr. Boyle. Thank you, Your Honors. Good morning. May it please the court, my name is Robert Boyle and I represent Ziad Yagi. There are several issues in both in the brief file and in the brief file, Ziad Yagi, Your Honor. Okay. The appellant, Ziad Yagi. There are several issues which we've all joined and we have conferred, so there will be some overlap. We have framed the argument so as not to be repetitive. Well, in recognition of the fact that there are three defendants, we gave you a little extra time.  Thank you, Your Honor. We appreciate that. With respect to Mr. Yagi, I intend to address the issues in the following order. First, the claim of sufficiency of the evidence, followed by the failure of the district court to give an adequate charge on the applicability of the First Amendment, and then some evidentiary issues given time and of course subject to the court's questions, the first being the admissibility or lack thereof of the testimony of the purported expert, Evan Coleman. The evidence was legally insufficient to establish that Ziad Yagi agreed with at least one other person to provide material support to a terrorist organization, or that he agreed, which is at least one other person, to actually murder or maim an individual in a foreign country. In this case, what is interesting is that the government's star witnesses, their cooperators, Daniel Boyd, Dylan Boyd, and Zachariah Boyd, all flatly denied any such agreement. Nor was there evidence that Ziad Yagi stated to anyone else that he in fact agreed to commit the crimes alleged in Counts 1 and 2. No weapons were recovered from Ziad Yagi or from any location attributable to him. And indeed, after June of 2007, he broke off all contact with Daniel Boyd and was not arrested until the rest of the people in this case until July 2009. Now of course the government submits that there was circumstantial evidence which showed the evidence of disagreement. And I'd like to go through some of that particular evidence to show that why, even when crediting it in the government's favor and crediting the government... Can I ask you about one piece of that evidence? Sure, you're welcome. What about the conversation about purchasing with Mr. Hassan about purchasing an AK-47 and then the participation in training with Hassan's .22 rifle and Boyd testified, I think, that that meant training for Jihad. Those were two pieces of evidence that struck me in this case. Yeah, and I'd like to address those, Your Honor. The discussion concerning the purchase of the AK-47, while certainly admissible, didn't establish an agreement to actually commit the crimes alleged in this indictment. And with respect to, I believe, Your Honor is referring to the conversation which was in the automobile concerning the peace shooter, the .22 caliber rifle, which was exhibited in the car. What we have here was a statement, and I'm not sure whether... I think it was confusing as to whether it was by Yagi or Hassan, that it was going to be used for training. Daniel Boyd himself testified... Now, the .22 was hidden down in a compartment in the car somewhere? According to the testimony, it was in some kind of box... It was hidden in a secret compartment or some kind in the car, right? It was inside a compartment, true, Your Honor. And it was shown to Daniel Boyd. But still, I would submit, it in and of itself did not establish evidence of any reason. You have to look at all this stuff. Absolutely. You don't look at it in isolation. It struck me that it must have modified the automobile somewhere or another so that they could fire a weapon down in that compartment between the seats. I don't think that that was the evidence at trial, but I want to address the issue about being used for training, which Daniel Boyd testified to. Boyd said he saw it. Oh, he saw it. There's no question. It was hidden down in the compartment in the car. Why would they hide that thing down in that spot? Your Honor, there's certainly any number of reasons. And what I submit to the court is that in and of itself, hiding it in a compartment is not evidence of an agreement. Daniel Boyd also testified that the term training is one that's commonly used in the community. It doesn't necessarily mean training for the purposes of jihad. Certainly, didn't much of the case depend upon the jury's assessment of whether the trips abroad were for family purposes and for marriage on the one hand, or for engaging in illicit and criminal acts on the other? Much of the case hinged on whether the jury believed Mr. Boyd's testimony that the trips to Jordan and the trips abroad were not for innocuous purposes. Well, except that, Your Honor, Mr. Boyd didn't testify to that. Mr. Boyd and his son, Zachariah and Dylan, all testified in now addressing the 2007 trip, and I'll get to the 2006 trip, that they were, in fact, for a family thing. That he brought his sons over to the Middle East to help in the grief process because he had just lost one son, Laquan. But the jury didn't buy that. This is the government's proof. And this is the government's star witness who is saying this. And there's nothing else coming from the government to say that it was anything otherwise. Well, on 6-12-07, Boyd and his son, Zachariah, departed the U.S. for Tel Aviv, and the very next day on 6-13-07, Yahya and his son departed Raleigh for Tel Aviv. That's right, Your Honor. And there's a real link, time-wise, to what seems to be going on. Oh, no question. But the key issue here, what was it? And Boyd made the reservations for him. And Boyd made the reservations. Boyd made the travel reservations. And they went to Jordan. They were to Israel. And they wouldn't let them in Israel. And they sent them back somewhere, to Germany or somewhere. And then they ended up going to Jordan, right? And they went over to get married, and that was code for something. Well, Your Honor, firstly, there was no, in terms of the way Boyd, and this is the government's proof now, not the defense's proof, described the circumstances of Yahya and Hassan going to Jordan then, was that Yahya found out he was going and said, gee, can I go too? Boyd says, you can go, because it has nothing to do with us. But once you're over there, you're on your own. And Hassan says, I want to go. The only other proof then, and there's no evidence in the FBI agents who testified at activities in the Middle East, and that's in terms of 06 and 07. But they went there for a purpose, or purposes, multiple purposes, as you described, trying to get to the battlefield. I would submit that there's no evidence of that, Your Honor. There was supposition of that. But there was no proof, either in terms of Yahya's statements or statements made by Yahya to Boyd, that that was, in fact, the purpose. It was certainly, it was circumstantial. Well, I thought that the use of the word marriage could be taken as a code for the battlefield. Boyd, one witness, and I don't think it was Boyd, it was maybe one of his sons, testified that that could be, that could have happened. And this was a person who had no direct contact with, in terms of that terminology, with Mr. Yahya. And the term, and we have to look, in 2006, Mr. Yahya said, one of the reasons he's going to Jordan is to get married. Daniel Boyd testified. Boyd said, that's the understanding. Everybody understood each other. Well. He kept talking about, we understood, we understood. And Boyd, in terms of 2006, and the testimony regarding marriage, actually provided Ziyad Yaghi with the name of a potential marriage prospect. And the only thing he testified about the 2007 conversation was that Mr. Yaghi and Mr. Hassan looked at each other sheepishly when the word marriage was stated, and he said there was nothing more to it than that. Can I ask you about, because the evidence supporting the counts is an important part of this matter. When Mr. Yaghi returned, he introduced Mr. Muhammad to Mr. Boyd, and then the government says on page 91 of this brief that Muhammad subsequently engaged in a quest for jihad and that Yaghi knew of his interest in jihad when he introduced him to Mr. Boyd, and then Yaghi also, after returning, continued to train with Mr. Hassan in firearms. And I'm just wondering, after a certain point, don't these pieces of evidence begin to add up to the point where a jury can draw a perfectly reasonable inference that we allow them to do all the time? A jury can certainly draw inferences, but I would like to address those evidence because the inferences of illegality there would not be reasonable. This is the actual question that was introduced at trial regarding Yaghi's introduction of Jude Muhammad. It was at page, the appendix of 1797. Question. This is by the government on redirect examination. Did Mr. Yaghi in fact bring co-defendant Jude Muhammad to your store? Answer, I mean, they came together, yeah. The government asked for an inference with two people arriving at a store together that this is somehow presenting Jude Muhammad to the conspiracy. The evidence is irrefutable that after that day, there was no meetings where Ziyad Yaghi and Jude Muhammad attended at the same time. Mr. Yaghi did not participate in any training, and Mr. Muhammad went out of it on his own. Thank you very much. Now, also, we appreciate your briefs, and simply because we don't get around to every issue in the argument that you've raised in your brief, you've not waived those issues at all, and we appreciate that. I appreciate that, Your Honor, because I think that the other issues aren't reversal as well. We understand. You haven't waived a thing. Thank you. Let's hear from Mr. Boyce now. Good morning, Your Honors. I am Dan Boyce, and I'm here representing Omar Hassan. I was both trial counsel for Mr. Hassan, so I participated in the trial, and I'm still on here as appellate counsel. Your Honors, I— You want an acquittal for your client on one of the counts? That is correct, Your Honor. That is the only acquittal of any of the charges of any of the roughly six to eight co-defendants in the case. He was acquitted—your client was convicted on count one of all of these? Only the providing support to a terrorist organization, providing material support to a terrorist organization. And there are essentially four trial errors that I'm ready to discuss, and there are two sentencing errors that I would also like to discuss if we have time. The first one is the insufficiency of evidence as to Omar Hassan. Mr. Boyle has already started into that, so I may be brief on that. The second one is the admissibility of some evidence, social media and opinion evidence, and then the subsequent narrowing or inadmissibility of some of that evidence, which we contend violated the rule of completeness. The third issue is the failure to properly instruct the jury on the First Amendment. The fourth trial issue is the court's refusal to instruct the jury on the Second Amendment. And then there are two sentencing issues. First, the application of the terrorism enhancement, and secondly, the court's refusal to apply a rolling defense reduction. With respect to the evidence and the insufficiency of evidence against Omar Hassan, the evidence could be really grouped into three categories. First, conversations about violent jihad, and there were a number of people who talked about the young Muslim men and boys in that community, in the Raleigh community, high school students and college students, who were debating about violent jihad and what the obligations of a Muslim are. The second major piece of evidence is specifically against Omar, and the only overt act in the superseding indictment was the summer of 2007 trip over to Israel, where they were denied entry, and then Omar and his friend Ziad Yagi then went to Jordan and hung out at the beach. He and Yagi went in 2007 together. Correct. And I asked the question I asked previously, as far as count one is concerned, the question it seemed to me was whether he went in Jordan to visit his family and find Omir White, or whether he went to engage in spread terrorist propaganda, and so one is a perfectly legitimate and benign purpose, but the other would be providing material support to terrorists, and the question is wouldn't we leave that kind of credibility matter up to a jury? But there still has to be an agreement, and I agree with Mr. Boyle. It was absolutely no evidence that Omar Hassan agreed to A, provide personnel, B, to provide You don't have to have these agreements all written up and notarized for anything. Certainly not. Conspiracies. The jury could infer from the facts that the defendants and others conspired and agreed. I would submit to you, Judge King, that there was no evidence at all circumstantial or otherwise as to who Omar Hassan agreed with. That's exactly the position you need to espouse, but the jury heard the evidence, and we take the view most favorable to the prosecution in the context of looking at these things, right? Absolutely. I think the standard is whether the evidence is like most favorable to the prosecution provides, and here's the key, substantial evidence of guilt. Well, what do you do, Counselor, what do you do with the fact that Hassan was an active participant in conversations with Mr. Boyle in which Mr. Boyle emphasized the importance of violence and the best strategies for achieving that violence, and Hassan was in regular contact with Mr. Boyle, and that prior to the trip with Mr. Yagi, Hassan actually purchased a .22 rifle from Mr. Yagi? Aren't those pieces of evidence that jurors could consider? Certainly they can consider it, but it's got all that out to show an agreement. First of all, he did not have regular conduct with Mr. Hassan. Mr. Hassan testified that he spent less than an hour with him one time, and it was a total of maybe two hours that he ever even talked with or saw Mr. Hassan. Is that a jury argument? No, I would argue you've got to consider all the evidence, and is there substantial evidence that Mr. Hassan entered into an agreement with him? Who purchased the tickets for him when he traveled to Israel? He used his own money to purchase the ticket. But was Boyd involved in that? Boyd bought Yagi's ticket. I'm not sure if he also bought Hassan's. Let's assume, arguing, because I don't remember specifically how that came out, but even if Mr. Boyd did, there's no evidence just because he bought him a ticket to travel overseas. The point you were making before is there's very little contact between Mr. Hassan and Mr. Boyd. The point is if he's purchasing tickets for him, something's going on. The contact was with Yagi. Hassan was a friend of Yagi, and Yagi had contact with Boyd. And when they were over there in the Mideast, they tried to contact Boyd several times unsuccessfully. They even contacted some of his people, his family back in North Carolina trying to reach him in the Mideast. And if you read the testimony of all three boys together, they all basically said, we didn't have an agreement with Omar Hassan to do anything. That was not the purpose of the trip. They were going separately, and the father, Daniel Boyd, even testified he had offered to show them the holy sites. One of Boyd's sons testified that Hassan and Yagi went on that trip to participate in violent jihad. Here's what he said. Dylan Boyd said, I honestly believe that jihad was the purpose of the 2007 Middle East trip, but that was with the limited information I had. And there was no evidence that Dylan Boyd ever talked to Omar Hassan about that trip. There was all this supposition and hearsay on hearsay as to what the boys, meaning Omar Hassan and Yagi, what they may have intended. But if you read the three boys who testified, none of them said there was any agreement before or during that trip to provide material support to a terrorist organization. What if the agreement your man was in to was only with Yagi? He would still be guilty. There's no evidence that he did agree. What if? I said that's a hypothetical question. Hypothetically. He went on that trip with him. They were over there trying to get into Israel, and they were bouncing around the Mideast and trying to contact Boyd unsuccessfully and all that stuff. The two of them. And what if the jury decided, well, at least those two guys were conspiring with each other, trying to reach the battlefield in the Mideast, and they wouldn't even have had to reach the question of whether Boyd was part of the conspiracy or not. Your hypothetical, Judge King, is if there was that agreement. No, but under the law, that would be enough. No, it would not. I would submit to you, Judge King, that it's guilt by association. You need something more than just associating with Ziad Yagi. Everybody that's named as a conspirator has to be guilty. They can find some involved and some not involved. They've just got to find a couple of conspirators. There is no doubt that Omar Hassan didn't need to know every single conspiracy agreement. They could have found him conspiring with somebody who wasn't even named in the indictment. Could have, but they didn't. They could have, but if the evidence permits it, that would be enough to undercut your argument that the evidence is not sufficient. But I would respectfully submit when you search through the record, when you come through it and read all the testimony, it's just not there. We haven't mentioned the fact that the firearms training, and as I understand it, he posted a video about his training regiment, and that ended with a support the troops emblem, which was interpreted as code for engaging in violent jihad. It was a video available to the world. It was a workout video where he jumped up on a table, jumped down, jumped up, jumped down, pumped iron, did weights, and as Mr. Boyd testified, Omar was a big, goofy kid who was more interested in working out than he was talking about violent jihad, or worse to that effect. And that video was years after the 2007 trip. The evidence presented to the jury was Omar Hassan went on that summer of 2007 trip and then disassociated himself from the Boyd family and didn't even know any of the other co-conspirators. So they tried to bring in a 2009 video clip on his phone of him shooting a gun across a lake. They tried to use a workout video that was a year after the 2007 trip. So there was no link. Did you have a chance to point out all of that at trial? We objected to it, and that's part of it. You went after the video at trial, didn't you? Yes, we did. We did. You know, you met with some success. What seems to me, you have a trial that lasts almost one month. That's a long, long trial. And it seems to me you have a lot of evidence about training regimens and travels abroad and recruitment of others. Now, in Mr. Hassan's case, it doesn't seem to... I was less clear about recruitment. I didn't see that. I did with Mr. Yagi, but I didn't see it with Mr. Hassan. But I certainly saw the training and the traveling abroad, and as Judge King points out, the constant contact with Mr. Boyd before and after. But anyway, when you have jurors that sit through a trial which lasts one month long, shouldn't we at the end of the day give some credit to the conclusions that they came up with? I mean, sometimes we have trials that maybe last a half a day or a day, but this one went on for a whole month. Right, and the problem was they heard over 40 witnesses who testified. There were literally hundreds of pieces of evidence that were introduced throughout that trial and only a miniscule amount even related to Omar Hassan. And again, I think what we have here, this case was tried on the 10th anniversary of 9-1-1. We vigorously opposed the date of the trial starting the week of 9-1-1, and you may remember that we were bombarded with information about terrorism and the 9-1-1 anniversary. We objected to it and we opposed to it, but we didn't have space to make an appeal. But my point is guilt by association. And when you go back and you look at the record, there is no agreement. The trip is an innocuous trip. There was no agreement as to going over there, conspiring with anybody, to provide material support to a terrorist organization. Aren't you making a very good jury argument? I think I'm making a very good appellate argument because there's got to be evidence to support me. How about you making a wonderful closing argument? Well, you made a good closing argument at the trial and you were successful, which also indicates and supports what Judge Wilkins was talking about, that jury was conscientious. It differentiated on your client substantially and only convicted him on one count. But when you look back again at the whole record, there's no evidence to show that that training, for instance, was in order to provide material support to a terrorist organization. Who was he trained for? What group was he trained to provide training to? The financial, they said he bought his own ticket, and that's providing financial support. The trip, again, it's an innocuous trip. What group, who was he providing material support to? It's just lacking. The other problem, Your Honor, was then we got the jury... We've given you some extra time. You've reserved some time for rebuttal. I did, Your Honor. Is that okay? Yes, sir. Thank you. Mr. Fisher, I'd like to hear from you. Your Honor, may it please the Court, Clark Fisher on behalf of the appellant, Tyson Sharifi, in this case. I would certainly echo the arguments made by the other counsel regarding the sufficiency of the evidence, and I'd like to amplify on those a little bit as it pertains to Mr. Sharifi. Now, we would certainly agree that when you read this very lengthy transcript, the word jihad pops up over and over and over again. I would tell the Court reading this thing was incredibly tedious, and I thought if I had to read jihad one more time, I was going to pull my hair out. Tyson Sharifi had a religious, political belief that it was his duty as a Muslim to engage in jihad somewhere. But that's not a crime. It's only a crime if that belief, and I think that ties into the First Amendment argument that's before the Court that we've all joined in, evolved into some specific plan to commit some specific terrorist act in violation of the statutes in question. What about the June 7th, 2008? It's alleged as an overreacting indictment where Boyd accepts $500 from your client to be used to help fund violent jihad. Well, I would contend, Your Honor, if you read the testimony, it was given by Mr. Sharifi, I think it's pretty close to a quote, for the sake of all, whatever that means, and I think you can interpret that a variety of different ways. I don't believe Boyd's testimony was, this is for some particular action. It was for the sake of Allah, which again goes back, I think, to what Sharifi's religious beliefs were, what he felt his duties as a Muslim were. Now, the one thing I wanted to ask you about on page 99 to 100, the government notes just one thing, that Mr. Sharifi helped Mr. Boyd build a bunker in which to hide weapons. I mean, that doesn't connect with anybody's beliefs. You don't have a First Amendment right to, I mean, because everybody in this country has a right to their own beliefs, and we take that very seriously. But building a bunker in which to hide weapons and helping Mr. Boyd do so, that goes beyond just believing in something, which we respect. But building a bunker is not tied to weapons, isn't tied to somebody's beliefs. That's conduct in furtherance of a criminal act, isn't it? I would contend that it's conduct in furtherance of what might be a political act or a criminal act, excuse me, if there is a plan to commit that specific criminal act. Otherwise, it's building a basement and you put some guns down there. You need one additional step. You need Sharifi and Boyd or at least one other of these people to agree, we're going to build that bunker, we're going to put those guns down there, and we're going to use those guns to take out an NC State gang or something like that as an act of terrorism. What about the recruitment of Mr. Weeks? I mean, here all three prongs are present, the training, the traveling abroad. He went to Kosovo, didn't he? Yes, sir. And the recruitment of others to engage in jihad. What I want to emphasize to you is this is active conduct. This is not simply speaking out about something. This is active conduct in furtherance of, as the jury found, a conspiracy to kidnap, murder, persons outside the United States. And no one has a right to do that. No one certainly does. I could not agree more with that. But again, kind of following up on the last argument I made in response to the previous question. Yes, indeed, he talked to Weeks. Weeks perceived that what his version of Islamic theology was, I think, was a weaponized form of Islam. And then there were some what-if discussions. Well, we've got some American military base over here. Maybe it's the duty of us to attack that base. Maybe. There was never any specific base name. And most importantly, just like with Quantico, there was no specific plan to do anything. He talked to Boyd. They planned to attack Quantico. Well, if you take what Mr. Boyd said to the FBI, I think the response when they asked him about Quantico was, quote, that is pure crap because there was no specific plan. Yes, maybe if we wanted to, we could do it. I think Boyd also said that, well, we talked about Quantico, that we could do that if there was a factor, if it was in furtherance of something. And that runs through a recurring frame throughout this trial. Maybe we could do this. Perhaps we should do that. But there was never that concrete evolution of these maybe plans into a concrete form of action. And I would submit to the court that it takes that level of concreteness before you have political or religious ramblings turning into a criminal conspiracy for any of these judges. Why can't it just be a selection of alternative targets? I mean, you phrased it one way. Why isn't it just a selection of alternative targets on the maybe? Maybe we can do this. Maybe we can do that. But the point is that if there's evidence to support that the notion that they would travel, they would do all these various things in support of it, you've got everything, it seems to me, you need as overt acts in furtherance of these things. I certainly understand the court's question. But again, I would come back to that. I think we needed that one additional step beyond maybe we could attack Quantico. Okay. This is how we're going to do it. And let's start the plan and roll it. I would contend what you have here is at most an inculate or perhaps a preliminary situation that never evolved into the full conspiracy. And just, you know, I know I'm over my time, but I think the fact that there was this degree of incompleteness to the conspiracy. But the judge gave instructions on all that. They did. They did. No question about that. And the issue was resolved by the jury. We're back again to in the light most favorable to the prosecution. Well, in the light most favorable. It made good day carry today on the points that you've argued. Yes, sir. And you argued to the jury. Well, I wasn't there. I'm like, was I kind of? His lawyer did. Yes, sir. No question about that. But if I can make one final point, I do think the incompleteness of the evidence, the certain lack of specificity is what made the expert testimony of Mr. Coleman, particularly his ultimate statement that this group had all of these characteristics that he named as indicating a homegrown terrorist organization, so damning. And I know we've all briefed that. Thank you. Thank you very much. Mr. Kelhoffer, we'd be pleased to hear from you, sir. May it please the court. I am Jason Kelhoffer, and I, along with Christine Fritz, represent the United States. The government's position is twofold. The appellant's convictions and the court's evidentiary rulings were supported by credible evidence, as well as the court's evidence. And then secondarily, the jury instructions and the appellant's sentences were appropriately based on the facts of this case and the charge at hand. Turning specifically to the sufficiency of the evidence argument that has been raised a few times here, I take dispute or issue with a few of the terms utilized. First of all, that Daniel Boyd was a star witness. This case was a conspiracy case. It dealt with bricks and a wall, and often conspiracy is not proven by showing a notarized agreement, as was mentioned by Judge Kennedy. Are you telling us that Mr. Boyd was not a star witness? Actually, no. Yes, Your Honor, I am saying that. But also, a lot of the briefs seem to concern what he said. Yes, absolutely. A lot of your own briefs seem to treat him as a star witness. I mean, whether he was or was not may not be here or there, but I certainly read a great deal about Mr. Boyd in your brief. He was an important witness. He was not the star witness, Your Honor. You had other co-conspirators who testified, both Dylan Boyd and Zachariah Boyd. You had two sources who interacted with the individuals. Well, when you got the indictment, you had to be prepared, I suppose, to try the case without any of the Boyds. Correct. Because you indicted them with these fellows. Absolutely, Your Honor. They played guilty. You turned them, as I say. Subsequently, yes, Your Honor. And we were absolutely prepared to move forward with the evidence at hand, which included email evidence that had statements of Mr. Hassan and Mr. Yagi, as well as statements that had been given to other individuals. So this case, my point is— Is there any claim here that cross-examination of the government's witnesses was cut short? I apologize, Your Honor. Could you repeat that? Is there any claim on the part of the appellants that cross-examination of government witnesses was cut short? I don't believe so, Your Honor. There seemed to be sufficiency arguments and instructional arguments and some evidentiary arguments, but just in terms of the overall fairness of the trial, I want to make sure that the defense had a chance to cross-examine. This was a lengthy trial, Your Honor, and it is the government's position that all of the defendants had the opportunity to cross-examine all of the witnesses. I didn't see a claim that we didn't have a chance to go at the government's witnesses. That is correct, Your Honor. They're complaining in their briefs—they haven't said much about it this morning— about y'all putting on that expert. That was pretty open-ended to get into that. I mean, you normally don't have a Daubert expert in a criminal case. Understood, Your Honor. In a conspiracy case. Yes, Your Honor. You can't bring in an expert who's a professor who's written books or something, and he gets up there and says, well, I've studied all this, and this is what I think happened. Well, I think the judge put it well. I mean, she thoroughly vetted the issue both at the Daubert hearing as well as through a written motion afterwards, and she specifically noted that the evidence in this case was voluminous, that it was complicated. There was a wide variety of ideas, terms, people, organizations, locations, theories, various aspects of radical Islam. All of those were necessary for Mr. Coleman, the expert to testify, to provide a broader frame of reference, and he did so. In this case, as I'm sure you're aware, having looked at the record, there are a lot of concepts that the typical person just simply isn't aware of, as well as locations, geographies. Mr. Coleman's been admitted as an expert in a number of other cases. Yes, Your Honor. Did he tie this violent jihad to getting married, or was that all rely on boys to testify? No, it was a conglomeration, Your Honor. He testified to the terminology often used by these networks, these jihadist Islamic extremist networks. He did mention terms such as good brothers, such as marriage, or finding a way. Finding a way. Finding a way to the battlefield. Yes, Your Honor. That was a concept that was talked about. Was that talked about by Coleman and boys as well? To the best of my recollection, Your Honor, yes. I was, Your Honor, yes. It certainly was a concept he discussed at length, and then the application of that was discussed with Daniel Boyd, as well as Dylan Boyd, who expressed that these statements, this terminology, the verbiage that they were using, was all intended to be covert. Which goes back to, you're not going to have this sit-down agreement. Yes, we agree to travel overseas to maim, murder, or kidnap individuals and to provide support towards that cause. No, you're not going to have that. What you're going to have is a lot of bricks on the wall that display that. And in this case, you have that. You have much, much more than words, as the appellants would seem to imply. You have purchase of travel. You have actual travel. You have seeking out of specific locations, as you recall. While Ziad Yagi, during 2006, was over in Jordan, he was emailing Daniel Boyd saying, is this the mosque, the one where we were talking about? Because he's talking about a conversation they previously had. And Daniel Boyd testified that that was in reference to the Best Brothers. And his understanding of what the Best Brothers meant was those that are like-minded, those that are of the opinion of this ideology, this ideology that requires violent acts, up to and including killing individuals overseas. You had other actions taken. The recruitment efforts, the transfer of propaganda itself, not stating your opinion, but rather providing propaganda documents, whether it be written, videos, CDs. You had physical training that took place. Mr. Son makes the case that, listen, this was just a video of a kid jumping up and down. Put that in context again. Another brick in the wall. Put that in context with Daniel Boyd's statements that, yeah, they talked about the need for physical training, the need for physical training for this cause. Firearm training. Yes, and firearm training. There was physical training and there was firearm training, absolutely. The physical training in the Ross video, it's important because it shows him doing that, but then it ends, and it ends with a picture of a flag, a black flag, a black flag that has on it the Shahada, which in and of itself, the Shahada is not a declaration of Muslim faith, simply that there is but one God and Muhammad is his messenger. However, superimposed on this was an outline of a firearm, an AK-47, not a U.S. firearm, and a statement to support the truce. Mr. Coleman, again being necessary, testified about the black flag and that the black flag was commonly utilized within the jihadist network. The training, the firearm training. That email address, the Kalashnikov-47, does that argue that that has had some relevance? Absolutely. All of the indications— Who got the email address from? That belonged to Mr. Yagi, Your Honor. And all of the indications from their Facebook page, contrary to simply being juvenile banter— The Kalashnikov that built the AK-47. I apologize, Your Honor? Kalashnikov was the designer of the weapon, the AK-47. Correct, Your Honor. Yes, commonly recognized as a weapon utilized by the mujahideen or the individuals that fight and cause the jihad overseas. The Facebook pages were rife with such evidence, Your Honor, indicating all an aggressiveness, and an aggressiveness towards U.S. troops, an aggressiveness towards a certain class of individuals, and that class of individuals were non-Muslims, all in line with the propaganda that they possessed, all in line with the statements by Daniel Boyd and Dylan Boyd as to what they were discussing and their beliefs. You know, in reference to Mr. Boyd, you certainly don't agree with everything he had to say. I would agree with that, Your Honor, and I said as much during closing that the jury was free to take, to choose and pick what they believed from that witness. I acknowledged this is a cooperating witness. Government often has difficulty with such witnesses. However, I would ask, and I asked the jury to compare his evidence, the statements that he said on the stand, with the evidence that was provided. What was cooperated with what he said? And it's my understanding that at the appellate level here, any inconsistencies between witnesses or within witness testimony should be resolved in favor of the government. Well, they're all resolved in favor of the jury verdict. Yes, Your Honor, and as a fact, in a light most favorable to you. Yes. Now, the weapons training is particularly valuable. The government took and went through great pains to lay out what type of ideology was being espoused by Daniel Boyd that Mr. Hassan and Mr. Yagi and Mr. Sharifi all participated in conversations and all expressed agreement towards that ideology. Now, that ideology, it is sort of the basis for things here because it is a little – first of all, they were not charged with conspiring to commit jihad. That's not a charge. And jihad in and of itself is an innocuous concept to some degree. It has many, many, many meanings. But what it meant to these individuals is what was most important. Under this ideology, they believe that any non-Muslim is known as a kufr, and it's somewhat of a derogatory term used by them, that the kufrs are a hindrance to the further growth of Islam, that Muslims, therefore, should not be ruled by kufr, that Muslims should be ruled under Sharia law, and that any non-Muslim government is, therefore, a kufr government and one that is, in effect, precluding and stopping Sharia law from happening. Therefore, under their cultish belief, you are obligated as a Muslim to take an offensive attack so that you're not later put in a position of being defensive. And so if you are a non-Muslim and you are in a Muslim land, that's a problem. And ridding the world, as much of this propaganda states, for example, the book of Jihad provided by Ziad Yaghi on his Facebook post, that this concept, these people who are non-Muslims, the kufr, are a cancer. That was the word utilized. And that it must be cut out. Now, understanding that was what they believed, the opponents would have you, it's similar to the opponents asking you, well, yeah, they all believed that robbing a bank was appropriate, but hey, nobody mentioned which bank, even though, yeah, they were all traveling to that bank. They were all going there. It's just big talk. That's not what the evidence showed. The sufficiency of the evidence is overwhelming. And I apologize. I'm getting sidetracked on the issue that I wanted to point out with the firearms. My point with this ideology is this is what they sat around discussing, as testified to by Daniel Boyd, all of them being participants and in agreement with. And then, later on, prior to the 2000 trip, they're in a car. And the reason they're in that car, according to Daniel Boyd, is that they had been at the masjid, essentially a church, and Yagi and Hassan came up and asked Daniel Boyd, hey, we need to talk to you privately. So they went for a ride. During the ride, that's when they showed him the weapon. So, first of all, it's we need to talk to you privately. There's a covert nature to this. Secondarily, when they do provide it to him, it was difficult to understand, granted, from the record, but it was somewhat covertly in some kind of compartment between the seats. And when they show it to Daniel Boyd, not showing it to their father, who they talk with or something, hey, Dad, I'm training with this. No, they're showing this to Daniel Boyd, a real advocate of these beliefs who they sit around and discuss it, and they say we're training. That's action. And it is hard, hard to come to any other conclusion that they were training in order to affect not maybe a specific plan as has been, or a concrete specific plan as has been stated was necessary, but rather, as under the law, they understood the unlawful nature of a plan or scheme, and that's what they were moving towards, and that they knowingly and intentionally joined that plan or scheme. So, yes, I believe that there was far more than simply words in this case, and that... I'm going to try to put the categories that went beyond mere words. It was physical and firearms training. Yes, Your Honor. It was recruitment. Yes, Your Honor. It was different forms of financial support, not in huge amounts, but $500, $80 there. Yes, Your Honor. There was travel abroad, communication with Boyd before and afterwards. So, am I missing any categories? It's not just an inchoate kind of conversation. It's a question of not of beliefs, but of deeds to put a violent plan into action. Yes, Your Honor. And specifically, for example, charge two required over an act. That's the way the jury looked at it. Yes, Your Honor. I believe so. And they were instructed as such in that specifically charge two required over an act, and these were all items presented to display that. With regard to the First Amendment that has been mentioned, Your Honor, I think it's important to point out... They said the instructions weren't good enough, right, on the First Amendment? Yes, Your Honor. Yes, and I think that ties into, as I stated at the outset, that the instructions were based off of the facts of this case and the charges of this case. And the district court went to great pains to review the instructions requested by appellants and went to great pains to determine whether any of those would be appropriate. And she appropriately executed her duty. The government would argue that the district court has a duty to exclude argument regarding a legally insufficient defense. And there's a variety of reasons for that. I think it falls right in line with, for example, 403, irrelevant evidence, that the appropriate value of a legally insufficient defense is simply irrelevant. It's a problem. And it's a problem because it has a danger of unfair prejudice to the government. It additionally confuses the issues and misleads the jury. And the fact of the matter is here, as Judge Wilkinson asked me, the defendants at trial had multiple opportunities to cross-examine each one of these individuals at great length and to test it. And what they're confusing here is their ability to test the evidence and argue the evidence with the First Amendment. They were certainly free to argue, look, these guys said these things, but they didn't mean X, Y, Z. The district court instructed the jury that no conviction could be based on beliefs alone? The district court instructed the jury as to the statement that you have the right of association, you have the right to freedom of religion. As to these charges, the First Amendment is not a defense. And that is an appropriate instruction because what the misleading here is that what the appellants are essentially getting at is if the government meets all of its elements for this burden, and the jury was appropriately instructed as to that heavy burden. As to the elements of the crime. Correct. And they were instructed. What the First Amendment defense argument would do is say, yes, they may have met that, but here's the First Amendment and you have a right to do these things. No. And that is a legally insufficient defense in this case. First Amendment simply is not. She could have instructed, could she not, that ideas alone are not sufficient, no matter how they may disagree with it, ideas alone are insufficient. And she didn't give such an instruction. I'm sorry. I missed the first part. Ideas alone are not sufficient to found a conviction. Yes, she gave all of the elements, but she didn't give an instruction to essentially to the effect that ideas alone are not enough. I think that would be a fair statement. She did not give that specific instruction. But she gave all of the elements. Correct. Which you say is sufficient. Yes, Your Honor. And I think that going that additional step would only be inviting some type of argument that for some reason the jury would be likely to do that. And in this case, they were instructed as to the elements that were necessary. Which of the elements involved overt acts and which of the counts required overt acts and which of the counts simply required an agreement? The easiest way to look at it is the count one is the only count that did not require the overt act when regarding a conspiracy. All right. The count one simply required an agreement. Correct, Your Honor. All right. How many counts were there here? I believe 11, Your Honor. But there are only five that are pertinent here. Yeah. The ones pertinent to these individuals would be one and two. Count one was one that did not have an overt act requirement. Correct, Your Honor. And as to that count, the instruction was given about the necessity for an agreement. Correct, Your Honor. And count two required an overt act. And it went beyond simply talking. And that instruction was properly given. Yes, Your Honor. It has to be an unlawful agreement. Yes. Right? Yeah, one. Unlawful agreement. Correct, Your Honor. Yes. And if there's a First Amendment defense to it, it would be more like a legal issue than a jury issue. Yes, Your Honor. And I think the judge appropriately It would be a legal attack on the statute. Yes. And the judge appropriately determined that you don't have a First Amendment right or a defense against your words that are in agreement of a conspiracy. You don't have a First Amendment right or a Second Amendment right to conduct illegal acts or to agree to commit illegal acts. I mean, you have a First Amendment right to your beliefs without question, but you don't have a First Amendment right to commit illegal acts or to launch a plan to commit illegal acts. I mean, but the point is the difference between belief and conduct and belief and planned action was clear. Yes, Your Honor. I believe that the government presented that evidence and argued it exactly in that manner. The... If the government is, or if the court is pleased with the argument with regard to the First Amendment, I'll address briefly the terrorism enhancement. The sentencing. Yes, the sentencing and terrorism enhancement, unless there are any further questions with regard to the First Amendment issue. Thank you, Your Honor. I will point out with regard to the terrorism enhancement that has been an issue as briefed by the appellants. This very much goes hand in hand, I think, with the sufficiency of the evidence. Does that apply to everybody? Yes, Your Honor, it does. All of them got it. Correct. Each of them got it. Yes, Your Honor. And the support that was used for that is very much hand in hand with the factual sufficiency evidence that we briefed as well that we've been talking about. That's really a factual finding, isn't it? It very much is, Your Honor. The one additional step that the terrorism enhancement sort of looks to is whether or not as to the... It's a question of intent. Yes, as to each individual. And it's a question of is there an intent to promote a crime of terrorism or to provide material support for terrorism? That is true. And then that goes right back into the sufficiency of the evidence with respect to intent. Yes, Your Honor. Although the government will acknowledge that it additionally, along with that, it phrases it such that the specific intent must have been calculated to influence or affect government conduct by intimidation or coercion or to retaliate against government conduct. But that's found under a preponderance standard or, as Shandi says, under a clear and convincing evidence standard. Your point is it passes muster under a clear and convincing evidence standard. And I gather the standard of review is still one of clear error on a factual finding. Yes, Your Honor. And as you noted, notably, the district court at the time found it by a clear and convincing standard. Right. Which is a heightened burden. Had all those Shandia cases come out by the time they all... No, Your Honor. At the time, the government had requested a preponderance of the evidence standard, and the court held this to a clear and convincing standard. Subsequently, Shandia came out. The evidence with regard to specific intent, and just to highlight for Your Honors, individually a little bit, because it is very easy to sort of look at the whole, but acknowledging when it comes to this particular element, it's specific intent of each individual, and it is somewhat improper to attribute the conspiratorial intent. Here, as to Mr. Hassan, there was testimony and evidence presented as to his clear distaste for Jews and those that were non-Muslims. And as Coleman testified, Israel is one of the top locations for these, within this extremist movement, to try and get to, to try and travel to for violent purposes. And that is precisely where these individuals attempted to go in 2007, though they were turned around. There were Facebook posts, a number of them, specifically... Well, didn't they get stopped at the airport in Tel Aviv, and then they were put on a plane and sent somewhere else? Yes, Your Honor. Essentially, at the border, Israel turned all four of these individuals around. Throughout his Facebook posts, he makes mention of, like, smoking Jews like a cigarette. He makes mention of murking, or as was testified to, murk is short for mercenary or assassinating all Americanized Muslims. He praises the Taliban through his Facebook posts, and he displays aggression against them. Now, who's the he and who's the she? This is all with regard to Hassan, sir. And within all of these Facebook posts, there's, between him and Yagi, there's an obvious aggression against law enforcement and government, constantly mentioning the feds. Jamar Carter was a friend of his who testified and said that, you know, he would show me these videos of car bombings and things of that nature in Iraq and Afghanistan, and that he praised the individuals fighting war against people invading their country. He sent 44 ways to Dylan Boyd, 44 ways to commit jihad. According to Agent Manila, when Hassan was arrested, he testified that, or he stated that the Mujahideen in Iraq were simply freedom fighters. The Ross training video that we mentioned of support our troops with a clear indication of it not being U.S. troops. And then he sent a video on his Facebook of, it was entitled, The Message of the Mujahideen to the Americans. And as was presented at trial, that was nothing short of war propaganda. It was displaying Mujahideen warriors putting IEDs down and blowing up cars and whatnot, and then it was overlaid with words to the effect of the Bush regime and the criminal American democracy. All of this goes towards that specific intent element with regard to retaliation against government conduct or their efforts being to intimidate the government. With regard to Yadi, shifting to him for a moment, the factual sufficiency evidence as we've laid out, again, the same thing with regard to his view of the Jewish people. On his Facebook, he has a link about the Palestinian, praising an individual who basically stated that they would rather cut their flesh out than allow any of Palestine be cut from the Muslim lands. All of this goes towards an aggression towards government conduct, a problem with governments. And under the enhancement, it may not be the U.S. government, it could be any government. He comments about an article about Somali Islamists joining with Hezbollah in regard to retaining Palestine, and he states that the Muslims are uniting against the Kufr, again, a government. Explain to me, though, why you're not starting to kind of drift away from the message. I mean, why are you not kind of drifting into this thing, into the First Amendment problem? Well, this is all with regard to his intent, Your Honor. We have his actions. And the question is, well, why did you do those things? Why did you train? Why did you go there? Why did you train? Intent and motive. Yes, and so this is solely for intent. With regard to Mr. Sharifi, I'll just briefly mention that the record is ripe with instances of his specific intent. To the level of, I'd be willing to fly a plane. The best place to go would be the White House or the Parliament in terms of getting to a battlefront. Clearly, he had an issue and an intent to retaliate against government conduct. I see that my time is about to expire. If there are no further questions. We have no further questions, sir. In consideration of the record, the government's written brief, and my attempt here to clarify our position, the government requests that this court deny Pollack's claims and affirm the findings of the district court. Thank you, sir. Mr. Boyd, you have some rebuttal time? Yes. Thank you, Ron. In his remarks, my adversary stated when addressing the sufficiency issue, quote, I want to point out why it was really necessary for the court to instruct the jury adequately on the First Amendment. The court never told the jury here that it could not convict on the basis of beliefs alone. They were never told that. But the elements of the crime were correctly submitted to the jury. And the elements of the crimes of 10 of the 11 counts, some of which are not at issue here, required overt acts. And it required something more than compensation. It went to the point of requiring an agreement to commit illegal acts. Your Honor, without the instruction, the jury was free here to decide that there was a conspiratorial agreement, an unlawful agreement, simply on the basis of the defendant's speech and their beliefs. Do you claim that any of the criminal statutes that were violated here are unconstitutional under the First or Second Amendment? No, Your Honor. We're not claiming that on this case. Because that's what you have to deal with, ain't it? The issue here, and with the gravamen of their defense, that while they may have embraced this radical form of Islam, that believed that it was a requirement at some point in the future to support or engage in jihad, that there was no unlawful agreement. And the government, in their summation, says, when you join those beliefs, when you sign up for that cause, you're saying, I agree with that. And so the government was urging the jury, in their summation, to find the agreement just on the basis of their beliefs and on their speech. That seems to me to oversimplify a little bit, because every crime has to have a men's right. And you need to understand part of the whole question here was, was the intent in undertaking the travel a benign intent, or was the intent to engage in violent jihad? And if it was a benign intent, that's perfectly fine. There's no criminal act. If there's an intention to engage in violent jihad, then that becomes different. But I don't see, there was no conviction here on the basis of mere belief. But on the other hand, in order to sketch out the intent, and in order to ascertain the men's right here, it's impossible not to get into why these trips were taken and why the training was undertaken. And in fact, you made that a central issue of the whole trial, by saying that all of the trips abroad were perfectly innocent and benign. And I don't understand why the government isn't able to counter that by saying, no, the intent in taking these trips was not at all benign. It was to engage as Count To described, to kidnap, murder, maim, and injure individuals abroad. But that seems to me part of the issue on which the case is enjoined, in which the issue is enjoined. And I don't understand how you can introduce evidence of a benign intent when the government can't counter it. The issue, Your Honor, is not whether the evidence of their beliefs was inadmissible. That's not our claim on this appeal. The issue is that those beliefs cannot constitute the basis of the agreement. In other words, the only thing we ask for is the trial court. That's fine, but if a constitutional statute is submitted to the jury and it correctly recites the elements of the crime, a constitutional statute is submitted to the jury, if it correctly recites the elements of the crime, I know of no law that would say that the district court committed reversible error in doing such a thing. I respectfully submit that the court wouldn't have to find the statute to be unconstitutional before there would be a jury instruction on really what was the defense theory. Okay, we're relying on Matthews and all those cases out of the Supreme Court, which said you're entitled to an instruction on your defense theory. And here the theory was that they may have had these beliefs, but it was not an unlawful agreement. And that's all that we ask the jury to do. It was protected by the First and Second Amendment. I mean, you're arguing on this part, you're saying what you did was protect it by the First Amendment, which is a backhanded way of saying that the statute is defective under the First Amendment. It's like it may be needed to file what we used to call a demur to the indictment or something. Your Honor, what we're saying here is that they couldn't be convicted only on that. The jury was screwed. I'm not going to interrupt. That's why they have the elements of the offense. They can't convict solely on that. Without this instruction, I would submit, and I know my time is way over here, the jury was screwed to say we're finding the agreement solely on their ideas and thoughts. And even if they rejected everything about the trust. It wasn't freedom. There was nothing in the instructions that said a jury can just find these people guilty of these various counts based on their ideas and thoughts. There was nothing that even hinted at that kind of fact. And a district judge is entitled to some discretion as to what instructions can be given and what instructions are not given. And you can look at these instructions. There is nothing that even comes close to saying that you can convict people on the basis of their ideas and beliefs. Just respectfully, and then I'll sit down. On the facts of this case, where so much of the proof were the defendant's conversations, the Facebook postings, the e-mails, all the things that counsel just, in terms of the terrorism enhancement, read from. It was, we respectfully submit an abuse of discretion not to at least tell the jury that that can't be the basis of the conviction. Essentially what you're arguing for is not something about the elements, but just kind of a cautionary instruction. An instruction on the defense, which would be more than just cautionary. But it's very similar to a cautionary instruction. And also because they were never told it was only admissible on intent, all of that evidence. It came in without that. Thank you very much for your indulgence and time. Thank you, sir. Mr. Boyce. Thank you, Your Honor. One or two things about what the government said. First of all, you asked the prosecutor whether our cross-examination was cut short. I would respectfully disagree. By the rulings of the court on some of the evidence, it cut our ability to cross-examine significantly. And by some of the rulings, I would submit it gutted our defense. For example, in the RawlsTraining.com video, they used the hearsay statement, support our troops. In that blog, or whatever you call it, Omar Hassan said, part of my religious faith is to become strong and in healthy shape. And then later on, he says, P.S., I do not support terrorists. The court refused to allow us to introduce that evidence. Where is the cross-examination point written? Where is the what? In your brief. I couldn't point to it right now, but we quote that phrase. I do not support terrorists. Is there an assignment of errors? Yes, Your Honor. You say the rule of completeness was contravened. Our ability to cross-examine was contravened by the court's ruling, both on the opinion evidence as well as the testimony surrounding the YouTube video and then, again, the Facebook. She allowed it all in en masse without having a witness lay the foundation for it. We didn't have the ability to cross-examination the Facebook witness as to how you put things on Facebook, whether it was Omar's thoughts or whether it was somebody else's thoughts. We argued Crawford v. Washington that we didn't have anybody that we could cross-examine on authentication and how the Facebook postings occurred. And then she limited our ability to cross-examine on parts of Facebook and parts of YouTube. I would say that was especially important in Omar Hassan's case because of the weakness of the government's case. They relied, again, on the trip. There was nothing, I don't think, on the trip. There might have been some pictures of the boys at the beach that were precluded. And the YouTube only had to do with training. And, again, under the government's theory, training, Boy Scouts have a badge for gun training. You learn to shoot a gun in Boy Scouts, you get a badge. Under their theory of the case, I would submit that a Boy Scout could be found guilty of providing material support to a terrorist if he had a Boy Scout badge for training in firearms and had some conversation on the Internet or Facebook about their belief, whether they thought violent jihad was a good thing or a bad thing. Putting it all together that way is what they were trying to do with respect to Omar Hassan. That's a different case. All right. The First Amendment argument, I would ask the court to look at the two cases that we cited on First Amendment jury instruction. That gutted our case, too. When the judge says the trial court instructed the First Amendment is not a defense and refused to give an explanation as to what type of speech or actions are constitutionally protected, her statement just to the fact that the First Amendment is not a defense gutted our case. We're not saying that actions aren't prosecutable. What we were saying, the mere belief or expression of one's belief is not prosecutable. And when the judge did not give that instruction, it gutted our case significantly. The other gutting of the case is her refusal to give any kind of statement to the jury about the Second Amendment. The fact that the mere possession of a gun, shooting it across a lake, is not in and of itself illegal activity. And shooting a gun across a lake doesn't show conspiring with somebody to provide material support to a terrorist. Thank you, sir. Mr. Fisher? I'll be brief. I appreciate you having your time to give us this morning. Let's fast forward a few years. Let's suppose the government operation has not rounded up these gentlemen and Mr. Boyd and Sharifi and everybody else is still out there. Let's suppose they are at Mr. Boyd's market. And instead of talking generally about jihad, they are expressing their outrage about how the Assad government in Syria is using chemical weapons against the rebels. And they make a plan. We're going to train and we're going to go over there and we are going to fight the Assad government. That would be a specific act, would be a specific plan, probably one that the government would hail them as heroes. But regardless, you know what the object of the action is. Here, because of the hundreds if not thousands of pages of ideology, without any framework, I would contend, respectfully disagreeing with Mr. Kelhoffer, that there was no plan to be the object of the conspiracy. Thank you. Thank you. We will come down and greet counsel and then take a brief recess.
judges: J. Harvie Wilkinson III, Robert B. King, Samuel G. Wilson